The final case this morning, or this afternoon, which is Baptist v. Ford Motor Company. May it please the court. My name is Ken Sensen. I'm the affluent plaintiff, James Baptist. We're here, as you know, because the district court granted summary judgment, and we're here on de novo review. Basically, the facts are my client was a forklift driver at Ford Motor Company. He was working about 3 in the morning. He crashed the front edge of the forklift into a pole, and he injured his wrist. He notified immediately his supervisor, Mr. Ducis, by text message, and he also went to the medical clinic on premises right there. There was nobody working at 3 a.m. They told him to come back later. He continues, he goes and sees his own doctor, Dr. Heller. Dr. Heller tells him that he can continue to work with a brace. He continues to work for two months, and then finally the pain is just too bad in his wrist, on his left wrist, and he goes back and sees Dr. Heller. Dr. Heller tells him that he needs surgery, that he should be on light duty, and that he cannot lift anything over 5 pounds. All that gets conveyed to Ford Motor Company immediately. Ford Motor Company, interestingly, well, I'd say a few things. Ford Motor Company has taken the position that the new restrictions that were put on my client when he went back to see Dr. Heller, the parts that included him having to get surgery, still allowed him to drive a forklift. And I would point out just the obvious here, which is, why would he have to change the restrictions if there was no change in his condition? And he knew, because he knew how my client had gotten the injury, that he was driving a forklift. So obviously he meant that he should not just wear a brace, he should do something more. And that was conveyed to them. The problem that I'm having with this case, Mr. Baptist, is that at least after the exchange in late June, if the plaintiff's doctor wanted to make it clear that he thought he should be off duty from driving a forklift, it seems like there was plenty of opportunity to get that information in front of Ford before he was fired. Well, I'd say a few things about that. First of all, when he came back with this note to Ford and said, listen, this is what my doctor said and I need surgery, Ford responded to him by saying, well, we acknowledge that that says that you're not supposed to drive a forklift. I'm sorry, where did it say that? Well, Dr. Lewis testified that three days after he brought that note in saying, hey, I can only have five-pound lifting authority, three days after that she overruled that restriction. And she told him, based upon the fact that she, as an internal medicine doctor who has no expertise in orthopedic surgery, as opposed to Dr. Heller who does, and who is the plant doctor on the premise making $300,000 or $400,000 a year being paid by Ford to treat people injured on the premise, that basically she was overruling that restriction. There's no reason to overrule it if the restriction itself doesn't restrict anything. And that's the position that Ford is taking. And, you know, I would also note here, you know, Dr. Lewis testified that regularly, if she was confused about what a restriction meant, she would call the doctor that issued it, not in her expertise, yet she made a choice here not to do that. And if you look at the history here, when my client first came in right after this happened and talked to them about what happened, they never said, well, we're concerned about whether the restrictions that your doctor has issued is broad enough. What did Ms. N, I can't pronounce her last name, but the claims representative for Ford say to him about what was going on? And what did Lewis say? And you can see all the e-mails. They're calling it high noon, ha-ha, laughing at him. They're mocking him in their correspondence to each other. And what is their defense that they're asserting right there? They're asserting that the incident never happened. They're asserting that his injury to his other wrist that he had surgery on at an earlier time somehow should be relevant to this injury, which is ridiculous. They're saying that he didn't report the incident. Only five or six weeks after he was hired. So, therefore, he would be precluded from even seeking workman's compensation benefits, which they even admitted at the depositions is not the law. The reality of it is, is even in their notes to each other, even in the claims representative's notes and in e-mails between her and Dr. Lewis, what did they say? They said that Dr. Lewis disagreed, and the claims representative disagreed, with Dr. Heller's recommendation of surgery. I mean, they were basically inserting their medical judgment in place of my client's doctor's medical judgment. And that's not right. And I don't know if there's, I mean, one of the problems I have in the district court opinions, I beg you to read the e-mails here between Dr. Lewis and Ms. N, because they expressed so much hostility, and the district court glossed over that. They glossed over the fact that Dr. Heller was recommending surgery. You know, I would point out here, the affidavit that I got from Dr. Heller afterwards said, when I said there was a five-pound weight restriction, I meant he couldn't drive a forklift. So how did Ford try to rebut that? They tried to have Dr. Lewis, after she gave her deposition in this case, which she never said this at her deposition, seven-hour deposition, not one word of this, she then presents an affidavit at summary judgment where she says, I interpret what Dr. Heller said when he said there's a five-pound weight restriction, and I interpret that to mean, well, he could drive a forklift. Well, if there was some ambiguity, first of all, I don't think she who has no expertise should be in the position of interpreting somebody else's words. Did he have the surgery? I'm sorry. Did he have the surgery? He has not yet, and the reason is because Ford refuses to pay for it, and right now he has no health insurance. That still is being litigated. The workman's compensation case is still out there. He's expressed repeatedly that he wishes to have the surgery, and hopefully soon we'll have it. He certainly still needs it. But in any event, you have a situation here where Dr. Lewis shouldn't have been in the business of trying to tell Dr. Heller what he meant in his own words. If she had some ambiguity, it was incumbent upon her to call him up on the phone and say, what did you mean by this? I gather you've criticized Dr. Lewis for this affidavit. I didn't hear any argument that her affidavit was inconsistent with any testimony in her deposition. Was it? I don't think it was, no. So that's perfectly permissible, right? Well, it's permissible in the sense that he's required to answer the questions you ask. Oh, yeah, yeah. I'm not suggesting that. I'm suggesting, first of all, the district court took my affidavit from Dr. Heller and completely discounted it. So you can't, you know, it's good for the- Well, on the theory that it wasn't disclosed to Ford at the relevant time, that he had provided the restrictions, he didn't say specifically he can't drive a forklift, the later expression of those intentions is not really very probative of anything. But let me ask you, if I could, about the episode that I find most troubling here, which is the conversation at the time of termination, where the plaintiff says that Ms. Spites said that if he dropped his worker's compensation claim and changed that to a personal injury, then he would not be fired. Correct. I was trying to see how that's presented to the district court, and what I found in your brief referred to paragraphs 33 and 34 of your statement of additional facts, and I don't see that there. I'd have to dig into the brief. I don't have it off the top of my head. I mean, as far as I knew, it was correctly cited in our brief. If it's not, I will try to- Well, your brief, look, I'm looking at just the-I don't try to site check everything before an oral argument, but I found a number of problems where you're at page four, you've got dates all garbled, you've got all years, the years are all mixed up on your assertion about Dr. Lewis removing the restrictions. You cite paragraph 29 of your statement of additional material facts. Paragraph 29 says June 24 was the last date that Baptist performed any work at Ford. Maybe I'm missing something here, but- No, I think what happened was he came back ready and able to work, except it had to be light duty. It couldn't be forklift, and they knew that- My point is that what's said in your brief has no apparent connection to the cited materials. I apologize for that, Judge. I believe that the briefs, I thought they were correct when I came over here. I candidly didn't check them because they hadn't been raised in the lower court. I do know the transcripts were part of the record below, so there is a basis to find it, but as you correctly point out, it's not your job to dig through the transcripts. So for that, I apologize. Wait a minute. Hang on a second. Maybe- Hang on. Okay, wait a minute. You cited the wrong pages. You got the right paragraphs, but you got the wrong document. Okay, I find them here now. Instead at short appendix 245 and 246 and at 243. So maybe it's a mess. It's there. I don't know how much we'll be able to sort it out. I'm happy to answer any questions. I just have one or two more points I'd like to make before I- Well, one point I'd like to make is gripping over five pounds, is that necessary to operate a forklift? Yes. And do you have testimony to that effect? Well, Dr. Heller signed an affidavit saying that's what he meant, yes. Dr. Heller, the orthopedic surgeon? Correct, who recommended surgery. How about somebody that operates a forklift? I mean, we were still in expert discovery. I mean, the question really here was whether or not there's a conflict between the medical recommendations of the internal medicine person who's employed by Ford. Well, he did say don't operate a forklift. That's my point. And I don't know whether it takes five pounds to operate a forklift with your one hand or not. One thing Ford could have done, and my client kept requesting here, is to have an IME by Ford's orthopedic surgeon. Instead, they found it more advantageous just to have their internal medicine on-plant doctor just overrule Heller's restrictions. And the reason she overruled them was because she saw that they didn't allow him to drive a forklift. There would be no need to overrule them. She could have taken the position, listen, this says you can still drive a forklift, so we're done. Go back to work. They didn't do that. She wrote in her own report, I overrule these restrictions. I'm striking them, and therefore you have to go back to work. Well, why did she strike them? She struck them because they knew he couldn't drive a forklift. And if there were any ambiguity from an orthopedic surgeon or his orthopedic surgeon, she certainly could have called him up and asked him what his position was. Which, you know, eventually she comes up with her own affidavit to interpret his state of mind, which has some questionable validity. I just want to make two final quick points. Time's up, counsel. Okay. I think I do have some water. Hopefully I can have it. Thank you. May it please the Court, Paul Hudson on behalf of Ford Motor Company. Your Honors, the plaintiff had to show in this case that Ford terminated him primarily in retaliation for filing a workers' compensation complaint and not for any other reason. This is a very limited claim under Illinois law, and the question before the Court here is not whether Mr. Baptist, back in 2012, was physically able to operate a forklift or not or whether a five-pound lifting and gripping limitation means someone should drive a forklift or not. Those are issues for the Workers' Compensation Tribunal. They're presently being litigated there. If Mr. Baptist is entitled to his benefits, then he'll recover them there. The limited claim before the Court here is whether he was fired because he filed that workers' compensation complaint. Or because he wouldn't drop it. I'm sorry, Your Honor. I just didn't hear the question. Or because he would not drop it. What do we make of the testimony about that last meeting where the plaintiff testifies that Spice said that if he dropped his workers' compensation claim and changed that to a claim of personal injury, then his absences would be overlooked and he would not be fired? We have a dispositive admission in the record that Spice did not rely on anything other than his attendance records in making the decision of terminating him. I'm sorry? A dispositive admission by whom? By Mr. Baptist. Where? In the supplemental appendix at 7, paragraph 46. It's stated as undisputed fact that Spice, quote, did not rely on anything other than Baptist's attendance records in making the decision to terminate him. And then as supplemental appendix 213, he does not rebut that statement of fact. And that's consistent with Spice's testimony in her deposition at 58-59. What are the details of the report? So are we supposed to ignore that testimony about Spice's offer to make it all go away if he dropped his workers' compensation claim? That sounds to me like I understand you dispute it, but it sounds to me like about as direct evidence of retaliatory intent and causation as I can imagine. She disputes that she made the sentence. I understand she disputes it. It's summary judgment. And he did put this in his statement of additional material facts, and I didn't see the district court address it. If we accept that she made the statement, what she said was immaterial because it didn't make a difference. Either way, he was going to have to submit a doctor's note. She's saying it would have made a difference. His testimony is that she said it would have made a difference, right? That's the testimony. His testimony was that she made this statement, and it's our position that that's immaterial whether that happened or not because she didn't rely on that in making the termination decision. I don't understand that argument. If you've got your decision-maker saying, I won't fire you if you drop your workers' compensation claim, that sounds like the heart of this remedy and this cause of action under Illinois law. But I think there with the admission that that did not make a difference to her termination decision. Where do you get that? I don't see where you get that admission, particularly in light of the statement of additional material facts. The more broad difficulty that I have with the summary judgment in this case is that even accepting what you call a dispositive admission, that he was fired for attendance issues, the attendance dispute was all bound up in the workers' compensation claim. The reason why he wasn't in attendance is because he had a dispute about whether he had to be in attendance because of the conflict between the employer's doctor and his own doctor. And that's, as I said, all bound up in the workers' compensation claim. So it seems that supplies the necessary inference or factual foundation for an inference or a reasonable inference that a jury could draw about causation. I think that the nub of the case there is that the doctor's restriction of a five-pound lifting or gripping limitation, that was conveyed to Ford. But what was not conveyed to Ford was any intent that he had after the fact that what I meant was I didn't want you to drive a forklift. We understand that. What about Dr. Lewis overruling that limitation? The record doesn't support that that's what happened. And, in fact, what Dr. Lewis testified was that she agreed with the limitations and she said, I didn't disagree with the restrictions from Dr. Heller, and it is not that I don't think they were appropriate or not appropriate. I didn't think they were necessary in order to do or complete the functions of his job. That's Supplemental Appendix 209, Paragraph 25. We also have Paragraph 22 there. Dr. Lewis concluded that the essential functions of Baptist forklift position did not implicate Baptist work restrictions. And so that's why we don't have the inference like in the grabs in the Clark cases where if the employer is actually faced with a doctor's note that says, this guy can't work, and the employer looks at that and says, I don't care, we're ordering him back to work anyway, that gives rise to an inference under that line of cases. So she's saying what I had in the question I asked is that she doesn't think five-pound gripping the left hand is involved in operating a forklift. That was her conclusion? Yes. And so what we don't have is the factual predicate to get this inference of retaliatory motive that was in this grabs case.  Do you sense that both Nukur Awadja and Lewis were hostile to this claim? In light of the kind of mocking tone? I think it's completely fair from the record to infer that they did not believe Mr. Baptist actually injured himself the way he said he did. The problem for Mr. Baptist there is those communications were not with the decision maker. They were not communicated to her. She didn't rely on them in making the determination. She certainly seemed to rely on the actions of Lewis, however, didn't she? I mean, if those absences had been excused under Lewis's authority, then Spites wouldn't have fired him, right? If the absences had been excused, she would not have fired him. That's correct. But I think that's the exact same situation as in the Beatty decision, where the decision maker made a termination decision based on absences, and it turned out the employee there actually had submitted a series of doctor's notes that should have excused his absence, and this court said that might be sloppy personnel practices, that that was not communicated to the ultimate decision maker, but it's not retaliation. And, Your Honor, I think the idea that this would have been exceedingly easy for him to cure rebuts any inference of retaliatory motive, because if he frees time when he was suspended for failing to show up for work for a month and Ford had received this lifting and gripping limitation, any reasonable employee in that situation would have gone to their doctor and said, That's clearly your best argument, but I don't see how it responds, at least for purposes of summary judgment, to this testimony about the final meeting. He has a big leap to get from, they fired me because I didn't show up to work for my job as a forklift operator for two months, which is a permissible reason for terminating him. And the real reason that they were hiding was that they were retaliating against me for filing a workers' compensation complaint. And that timeline, I think, strongly undercuts that inference. And so what else does he have? He tries to rely on this grabs inference based on conflicting medical testimony, conflicting medical opinions, but Ford was not actually faced with conflicting medical opinions there. The problem here is that he has to give up the heart of his claim, the heart of his factual claim in the workers' compensation case in order to maintain his employment and comply with the order to come back to work. And we've got cases that say that that catch-22 is cognizable as a retaliation claim under the Illinois workers' compensation law. What I think we don't have here is that catch-22. I agree. If he had a doctor's letter that said, you can't drive a forklift or you're ordered off of work. Well, that's how he is telling us that this note from his treating doctor has to be interpreted. There may be a dispute of fact about how that note should be interpreted, but that's not first summary judgment. The only relevant dispute of fact is whether Ford, in its employees' minds, had a nefarious motive here. So even if there's a factual dispute about what he intended, we can grant him that inference on summary judgment. We can grant him the inference that the doctor did really intend for his letter to mean, the guy shouldn't be driving a forklift. But the inference that is missing is the inference that Ford knew that, that Ford was faced with that conflicting medical opinion. And we have, undisputed in the record, that Ford did not take the letter that way and that Dr. Lewis, in fact, read it as consistent with driving a forklift. So we don't have that critical factual predicate that would support the inference. But apparently there's also evidence that she did have a nefarious motive linked to his workers' compensation claim. I don't agree with that, Your Honor. I'm not sure what the court is referring to. Emails and whatnot. Emails that they didn't believe Mr. Baptist's position, but certainly it can't be the case that any time a plant doctor or a workers' compensation administrator believes that a guy is not being truthful, that that gives rise to some kind of inference that down the road, four months later when he's terminated, that the real reason is not because he didn't show up for two months, but because he filed some workers' compensation claim. Certainly when the ultimate decision maker didn't know the details or status of that, relied on nothing other than the fact that he didn't show up for two months. With that, Your Honor, I ask that the court affirm the district court's grant of summary judgment. Thank you. Thank you, Your Honor. Thanks to both counsel. The case is taken under advisement, and the court will be in recess.